**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ROGER D. SILK,

*Plaintiff-Appellant,*

v.

BARON BOND; HOWARD B. MILLER, in their capacity as Personal Representatives of the Estate of Frank Bond,

*Defendants-Appellees.*

No. 21-56286

D.C. No. 2:21-cv-03977-ODW-JPR

OPINION

Appeal from the United States District Court for the Central District of California Otis D. Wright II, District Judge, Presiding

Argued and Submitted January 10, 2023 Pasadena, California

Filed April 10, 2023

Before: Paul J. Watford, Michelle T. Friedland, and Mark J. Bennett, Circuit Judges.

Opinion by Judge Bennett

## SUMMARY[*]

### Personal Jurisdiction

The panel reversed the district court's judgment dismissing for lack of personal jurisdiction Roger Silk's suit alleging breach of contract.

Silk provided Frank Bond tax- and estate-planning services. When Bond died, Silk filed a claim in Baltimore County Orphans' Court against Bond's Estate for fees allegedly due under contracts. After the Estate disallowed the claim, Silk sued in federal court.

Following the U.S. Supreme Court's decision in *Marshall v. Marshall*, 547 U.S. 293 (2006), this Court held that the probate exception bar to federal jurisdiction was limited to cases in which the federal courts would be called on to "(1) probate or annul a will, (2) administer a decedent's estate, or (3) assume *in rem* jurisdiction over property that is in the custody of the probate court." *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1252 (9th Cir. 2017).

The panel held that none of the *Goncalves* categories applied to Silk's suit against the Estate. First, neither party contends that Silk was seeking to annul or probate Bond's will. Second, this suit does not require the federal courts to administer Bond's Estate. Valuing an estate to calculate contract damages is not administering an estate. Third, this suit does not require the federal courts to assume in rem

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

jurisdiction over property in the custody of the probate court. If Silk were to prevail at trial, he would be awarded an in personam judgment for money damages. Also, the fact that assets under control of the Orphans' Court might ultimately have to satisfy a federal court judgment or a federal court order to pay court expenses does not mean that any such judgment or order is an order disposing of assets under the control of the Orphans' Court. Finally, this decision is consistent with authority from other circuits.

The panel held that Silk made out a prima facie case of personal jurisdiction. Under California's long-arm statute for the exercise of personal jurisdiction, the Estate had "minimum contacts" with California. During his life, Frank Bond established purposeful contact with California via his contacts with Silk, then a California resident, for services. In doing so, Bond created a muti-year business relationship with Silk in California. The panel held that it was reasonable for California courts to exercise specific personal jurisdiction over Bond's Estate. The panel rejected the Estate's challenges to the exercise of personal jurisdiction.

The panel held that the district court erred in holding that Silk's suit was barred by the probate exception to federal jurisdiction. Because at this stage of the proceedings Silk has made a prima facie case for personal jurisdiction over the Estate, the panel reversed and remanded for further proceedings.

**COUNSEL**

Paul Fattaruso (argued), Adina Levine, and Jason Cyrulnik, Cyrulnik Fattaruso LLP, New York, New York; Sara Colón and Ethan J. Brown, Brown Neri Smith Khan LLP, Los Angeles, California; for Plaintiff-Appellant.

Jeffrey E. Nusinov (argued), Nusinov Smith LLP, Baltimore, Maryland; Gary A. Nye and Joseph C. Gjonola, Roxborough Pomerance Nye & Adreani LLP, Woodland Hills, California; for Defendants-Appellees.

**OPINION**

BENNETT, Circuit Judge:

As the Supreme Court has reminded us, "[i]t is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should . . . We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." *Marshall v. Marshall*, 547 U.S. 293, 298–99 (2006) (ellipsis in original) (quoting *Cohens v. Virginia*, 19 U.S. 264, 404 (1821)).

Plaintiff-Appellant Roger Silk provided Frank Bond tax- and estate-planning services. Under contracts between Silk and Bond, part of Silk's compensation was to be based on savings realized by Bond's Estate. These "incentive fees" were intended to align Silk's financial interests with Bond's, and due to their nature, could be paid only after Bond's death. When Bond died, Silk filed a claim in a Maryland

probate court[1] against Bond's Estate for fees he contended were due to him under the contracts.  After the Estate disallowed the claim, Silk sued in federal court.[2]  The district court dismissed Silk's suit for lack of subject matter jurisdiction, finding that the suit was barred by the "probate exception" to federal court jurisdiction.  But because the probate exception does not strip federal court jurisdiction over this routine contract dispute, and because at this stage of the proceedings Silk has made a prima facie case for personal jurisdiction over the Estate, we reverse and remand for further proceedings.

## BACKGROUND

For more than two decades, Roger Silk provided tax- and estate-planning services to Frank Bond.[3]  Bond, who died in July 2020, had approximately $40 million in liquid assets at the time he retained Silk—monies he amassed by launching a health and fitness business, U.S. Health, Inc., which he later sold.

Bond hated paying income taxes, and he retained Silk for various financial services, including to legally shield his assets from the taxing authorities.  From approximately 1991 to 1995, Silk worked exclusively for Bond, supervising his investment portfolio, addressing issues regarding insurance

---

[1] Baltimore County Orphans' Court ("Orphans' Court").

[2] No argument has been made on appeal that the determination of the Orphans' Court is somehow entitled to preclusive effect as to the merits of Silk's claim for fees.

[3] As the Estate brought a facial challenge to jurisdiction, we accept all plausibly pleaded facts in the Complaint as true.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).

and philanthropic entities, and "quarterbacking the team" of professionals who also advised Bond on tax issues. In the early 1990s, Silk developed a private variable annuity for Bond, which would lead to tax savings for Bond through deferral. In exchange for the creation of the annuity, Bond agreed to pay Silk 15% of tax savings attributable to the annuity strategy. The two agreed that the incentive payment would be paid at the earlier of the end of the tax deferral period, or Bond's death.[4]

Silk and Bond also made other deals involving incentive fees. In 1998, Silk provided Bond with tax planning involving an existing Grantor Retained Interest Trust (GRIT) related to Bond's interest in a shopping center limited partnership. In June 1999, Bond and Silk signed a contract that set out the work Silk was to do. The contract provided that the incentive fee would "only become payable upon [Bond's] death," and, based on the formula in the contract, would be "computed in good faith" by a named accounting firm "or any other independent accounting firm selected by [Bond's] personal representatives." The contract also provided that the incentive fee would "constitute a valid and binding obligation on [Bond's] estate," and Bond agreed to "alert [his] personal representatives to" the agreement.

In the same year, Silk and Bond also signed a contract concerning certain apartments. Silk, again, provided tax planning services, and, again, his compensation was to be an incentive fee based on a contractual formula. And again, the incentive fee would only "become payable upon [Bond's] death." This fee, too, was to be "computed in good faith" by the same named accounting firm "or any other independent

---

[4] Bond's death occurred prior to the end of the tax deferral period.

accounting firm selected by [Bond's] personal representatives." The contract also provided that the incentive fee was a "valid and binding obligation of [Bond's] estate," and that Bond would alert his personal representatives to the agreement.[5]

After Bond died in 2020, Silk filed a $3.1 million claim against the Estate in Orphans' Court. The Estate disallowed the claim, and the notice of disallowance stated that Silk's claim would "be forever barred unless within 60 days after the mailing of this notice you file a petition for allowance of the disallowed amount in the Orphans' Court *or a suit against the personal representative*."

Silk sued Baron Bond (Bond's son) and Howard Miller, the personal representatives of the Bond Estate.[6] Silk sought breach of contract damages based on the unpaid incentive fees arising from the three contracts described above. The suit alternatively sought damages based on unjust enrichment and promissory estoppel. Under all theories, Silk also sought an accounting sufficient to calculate the incentive fees.

The Estate moved to dismiss under Federal Rule of Civil Procedure 12(b)(1), arguing that the suit was barred, in its entirety, by the probate exception. The district court granted the motion and dismissed the case. The court held that,

---

[5] The copy of the contract appended to the Complaint contains a handwritten notation reading: "Explained 8/26/99 Howard B. Miller." Howard Miller was Bond's longtime attorney and is one of the personal representatives of Bond's Estate.

[6] Because Silk does not seek relief from the defendant personal representatives in their personal capacities, we refer to them as the Estate.

because the claim "cannot be resolved without first determining the value of the Estate," the court would be required to take control of the appraisal process, which "would amount to the administration of Decedent's Estate—a right reserved to the state probate court." It also held that as the contracts required the Estate to pay the cost of any appraisal, ordering an appraisal would "improperly interfere with the probate court's authority and dispose of estate assets in its control." While the district court did not apply the doctrine of "prior exclusive jurisdiction,"[7] it noted that "Silk acknowledged the probate court's jurisdiction by first filing his claim in the Baltimore County Orphans' Court." Silk appeals from the district court's grant of a motion to dismiss for lack of subject matter jurisdiction, which we review de novo. *See U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121, 1126 (9th Cir. 2015) (en banc).

## I.

In *Marshall v. Marshall*, the petitioner sought review in the Supreme Court of a decision from our court dismissing an action under the probate exception. We had held that although tortious interference claims arising out of the death of J. Howard Marshall, II did "not involve the administration of an estate, the probate of a will, or any other purely probate matter," the probate exception still applied because the

---

[7] The "prior exclusive jurisdiction doctrine holds that when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*." *Chapman v. Deutsche Bank Nat'l Tr. Co.*, 651 F.3d 1039, 1043 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Marshall*, 547 U.S. at 311). Because we conclude that the federal district court would not be required to assume in rem jurisdiction were Silk's case to proceed, we hold that the prior exclusive jurisdiction doctrine does not apply.

claims raised "questions which would ordinarily be decided by a probate court in determining the validity of the decedent's estate planning instrument." *In re Marshall*, 392 F.3d 1118, 1133 (9th Cir. 2004), *rev'd sub nom. Marshall v. Marshall*, 547 U.S. 293 (2006). The Supreme Court reversed. The Court first emphasized the narrowness of the probate exception, 547 U.S. at 305, and then held that while "the probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate" and "precludes federal courts from endeavoring to dispose of property" in the custody of the state probate court, "it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction," *id.* at 311–12. The Court also stated: "We hold that the Ninth Circuit had no warrant from Congress, or from decisions of this Court, for its sweeping extension of the probate exception."[8] *Id.* at 299–300.

Following *Marshall*, we have since held that the probate exception is limited to cases in which the federal courts would be called on to "(1) probate or annul a will, (2) administer a decedent's estate, or (3) assume *in rem* jurisdiction over property that is in the custody of the probate court." *Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1252 (9th Cir. 2017) (quoting *Three Keys Ltd. v. SR Util. Holding Co.*, 540 F.3d 220, 227 (3d Cir. 2008)). None of the *Goncalves* categories applies to Silk's suit against the Estate.

---

[8] Justice Stevens, concurring in part, and concurring in the judgment, referred to the "so-called" probate exception and wrote: "I do not believe there is any 'probate exception' that ousts a federal court of jurisdiction it otherwise possesses." 547 U.S. at 315, 318.

## A.  Probate or Annul a Will

Neither party contends Silk is seeking to annul or probate Bond's will.

## B.  Estate Administration

This suit does not require the federal courts to administer Bond's Estate.  Yet the district court reasoned that hearing Silk's claim would require it to "assume control over an estate appraisal" in order to "determine what portion of the Estate" is due to Silk under the incentive fee agreements. The court reasoned that taking "control of the appraisal would amount to the administration of [the] Decedent's Estate."  On appeal, the Estate likewise argues that Silk's lawsuit would require the district court to administer Bond's estate.  But valuing an estate to calculate contract damages is not administering an estate.

The Estate urges us to repeat the mistake we made in *Marshall*.  It argues that by valuing estate property, the district court would be *interfering* with the Maryland probate proceedings.[9]  This so-called interference allegedly occurs because "Maryland's Estates & Trusts Article establishes a comprehensive framework for estate appraisals."  According to the Estate, the fact that the contracts would obligate it to also pay for an independent appraisal to calculate Silk's fees

---

[9] The Estate's brief claims that "in contrast to *Marshall* where the adjudication of a tortious interference claim implicated no special proficiency available in state court, the case at bar entails operations for which the probate court is emphatically the best suited forum."  We disagree that the probate court is the "best suited forum" for resolving a contract dispute like the one here.  But even were that not so, just like there is no "interference" category of the probate exception, there is similarly no "best suited forum" category.

moves this case into the province of estate administration. And as noted above, the district court adopted the Estate's view, finding that entertaining this action would "improperly interfere with the probate court's authority."

Although appraisal is a component of estate administration, Maryland's regulation of appraisals as part of the probate process has no legal bearing on whether a federal district court may order an appraisal as part of a contract action. And in the context of this case, an appraisal is specifically contemplated by the contract between the parties. For purposes of Silk's breach of contract action, an appraisal of the Estate's value is a matter of contract interpretation, purely incidental to the task of the probate court in administering the estate. To be sure, there is an overlap between any Orphans' Court estate appraisal and any other estate appraisal. But the Supreme Court in *Marshall* rejected the notion that such factual overlap implicates the probate exception.

As the Supreme Court stated:

> In the Ninth Circuit's view, a claim falls within the probate exception if it raises "questions which would ordinarily be decided by a probate court in determining the validity of the decedent's estate planning instrument," whether those questions involve "fraud, undue influence, or tortious interference with the testator's intent."

547 U.S. at 304 (alterations omitted). Indeed, we had held that the exercise of federal jurisdiction over tortious interference claims would "interfere with the Texas probate

court proceedings." *In re Marshall*, 392 F.3d at 1134. But the Supreme Court made clear that our view was wrong:

> In short, [courts should] comprehend the "interference" language in *Markham* [*v. Allen*, 326 U.S. 490 (1946)] as essentially a reiteration of the general principle that, when one court is exercising *in rem* jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*.

547 U.S. at 311.

So the question is not whether we would somehow be duplicating the function of the probate court, or deciding a question the probate court will (or might) need to decide. And as the Supreme Court has also told us, the question is not whether we would be "interfer[ing]" with the probate court. *See id.* If the district court would neither be probating or annulling a will (it wouldn't be here), or administering a decedent's estate (and again, it wouldn't be here), the only question is whether it would be assuming in rem jurisdiction over property that is in the custody of the probate court, including by endeavoring to dispose of such property. *See Goncalves*, 865 F.3d at 1252.

## C. In Rem Jurisdiction/Disposal of Property

### 1. In Rem Jurisdiction

This suit does not require the federal courts to assume in rem jurisdiction over property in the custody of the probate court. Though "[w]e recognize that the distinction between *in rem* and *in personam* is often as elusive as the boundary lines of the probate exception," *Three Keys Ltd.*, 540 F.3d at 229, this suit involves the standard exercise of in personam

jurisdiction over the personal representatives of Bond's Estate. Accordingly, the third *Goncalves* category does not apply.

"An action is *in rem* when it determines interests in specific property as against the whole world." *Goncalves*, 865 F.3d at 1254 (internal quotation marks and alteration omitted). If the action seeks "merely to determine the personal rights and obligations of the parties," on the other hand, it is in personam. *Id.* (cleaned up). In assessing whether an action is in rem or in personam, courts "look behind the form of the action to the gravamen of a complaint and the nature of the right sued on." *State Eng'r v. S. Fork Band of the Te-Moak Tribe of W. Shoshone Indians of Nev.*, 339 F.3d 804, 810–11 (9th Cir. 2003) (internal quotation marks omitted).

The "nature of the right sued on" here is purely contractual. Silk's claims against the Estate are for breach of contract or, in the alternative, unjust enrichment and promissory estoppel. The "gravamen" of Silk's complaint is that Bond breached a series of contracts, and Bond's Estate now owes him money. Actions for breach of contract are in personam claims because they are, by their nature, claims between discrete entities and not between individuals and the world at large. *See* 20 Am. Jur. 2d Courts § 80 (2d ed. 2023) ("When the cause of action is based on a contract and the action seeks damages on the ground of breach of contract, the action is transitory in nature and may be adjudicated by any court which has jurisdiction in personam of the defendant . . . ."); *see also In Personam*, Black's Law Dictionary (11th ed. 2019) ("A normal action brought by one person against another for breach of contract is a common example of an action *in personam*."). Thus, even though an estate is a *res*, *see Marshall*, 547 U.S. at 310–11, and even

though the Estate is in the process of probate administration, Silk's claims that Bond breached their contracts are not claims against the world: They are claims against Bond as a contracting party who has now died.

The Estate argues that Silk's suit would "require[] the district court to assume core probate functions" were it to calculate the damages Silk seeks. But the limited accounting called for in the contracts does not somehow transform an in personam action into an in rem action, nor otherwise bring a suit within the ambit of the probate exception, particularly when the accounting is contemplated by the very contracts Silk is trying to enforce.

As noted in *Goncalves*, *Commonwealth Trust Co. of Pittsburgh v. Bradford*, 297 U.S. 613, 619 (1936), held that an action for determination of rights to trust funds was an action in personam, not in rem, because it sought "only to establish rights" rather than to "deal with the property and other distribution." 865 F.3d at 1254. In *Bradford*, the defendant argued that "no adjudication was possible in the absence of an accounting" of the trust and that "to enforce the remedy sought would necessarily interfere with possession and control of the res in the custody of the Orphans' Court." 297 U.S. at 618. Unpersuaded, the Supreme Court reasoned that whatever control the Orphans' Court had over the trust

> did not materially differ from that exercised by probate courts over such fiduciaries as guardians, administrators, executors, etc. The jurisdiction of federal courts to entertain suits against the latter is clear, *when instituted in order to determine the validity of claims against the estate* or claimants' interests

therein. *Such proceedings are not in rem;* they seek only to establish rights; judgments therein do not deal with the property and order distribution; they adjudicate questions which precede distribution.

*Id.* at 619 (emphasis added).

If Silk were to prevail at trial, he would be awarded an in personam judgment for money damages. As *Goncalves* notes, a "federal court may proceed to judgment in personam, adjudicating rights in the res and leaving the in personam judgment to bind as res judicata the court having jurisdiction of the res." 865 F.3d at 1254 (internal quotation marks omitted) (quoting *Jackson v. U.S. Nat'l Bank*, 153 F. Supp. 104, 110 (D. Or. 1957)); [10] *see also Action*, Black's Law Dictionary (11th ed. 2019) (defining an "action in personam" as one "brought against a person rather than property" that "can be enforced against all the property of the judgment-debtor"). Silk obtaining an in personam judgment against the Estate does not by itself get Silk any money. If Silk were to prevail in federal court, he would "need to present, in a probate court, any judgment obtained, if he desired payment from the assets under" that court's control. *Pufahl v. Est. of Parks*, 299 U.S. 217, 226 (1936); *see also Byers v. McAuley*, 149 U.S. 608, 620 (1893) ("A citizen of another state may establish a debt against the estate, but the debt thus established must take its place and

---

[10] For the same reason, the Estate's concern about "warring appraisals" is misplaced. *See also Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc.*, 918 F.2d 1065, 1072 (2d Cir. 1990) ("[T]he . . . probate court will be obliged to give full faith and credit to the district court's adjudication.").

share of the estate as administered by the probate court . . . ." (citation omitted)). The "marshaling of that claim with others, its priority, if any, in distribution, and all similar questions [would be] for the probate court upon presentation to it of the judgment or decree of the federal court." *Pufahl*, 299 U.S. at 226; *see also* Dan B. Dobbs & Caprice L. Roberts, Law of Remedies § 1.4 (3d ed. 2018) ("Ordinary money judgments reflect an adjudication of liability but they do not enter any command to defendant.").

## 2. Disposal of Property

As discussed above, the Court in *Marshall* held that the probate exception precludes federal courts from endeavoring to dispose of property in the custody of a state probate court. 547 U.S. at 311–12. The district court here found that because the contracts at issue require the Estate to pay for the relevant appraisals, ordering such appraisals (which was, in the court's view, a prerequisite to determining damages), would be the same as the court disposing of estate assets under the control of the Orphans' Court. And the Estate suggests that entering a damages judgment against it would do the same. But neither ordering an appraisal nor entering a money judgment against the Estate would "dispose" of assets in the control of the Orphans' Court any more than defending a lawsuit—something no one contends the Estate is disallowed from doing.[11]

---

[11] Similarly, when the Tax Court must decide what an estate is worth, it too is obviously not "disposing" of the property it values. *See, e.g.*, *Est. of Kollsman v. Comm'r*, 113 T.C.M. (CCH) 1172 (T.C. 2017) (determining fair market value of estate's paintings). Mere valuation is not disposal.

The fact that assets under the control of the Orphans' Court might ultimately have to satisfy a federal court judgment or a federal court order to pay court expenses does not mean that any such judgment or order is an order *disposing* of assets under the control of the Orphans' Court. *See* 13E Wright & Miller, Federal Practice and Procedure § 3610 (3d ed. 2022) ("[T]he federal courts will entertain suits by claimants to establish a right to a distributive share of an estate . . . or a debt due from the decedent."); *Hess v. Reynolds*, 113 U.S. 73, 77 (1885) (noting that while "[i]t may be convenient" for "all debts to be paid out of the assets of a deceased man's estate" to be established in probate court, that convenience does not deprive federal courts of jurisdiction merely "because the judgment may affect the administration or distribution in another forum of the assets of the decedent's estate"). To hold otherwise would have us commit the same mistake we committed in *Marshall*—authoring a "sweeping extension of the probate exception," with no "warrant" from either Congress or the Supreme Court. 547 U.S. at 299–300.

## D.  Supporting Out-of-Circuit Authority

Our decision is consistent with authority from other circuits. In *Glassie v. Doucette*, 55 F.4th 58 (1st Cir. 2022), Glassie sued "favored beneficiaries" of her father's will and the executor of his estate under, among other things, federal RICO laws, 18 U.S.C. § 1962. 55 F.4th at 62. Glassie's primary allegation was that, in concert with other favored beneficiaries, the executor of her father's estate fraudulently obtained a loan guaranteed by the estate which was used to collect interest payments from the estate, and this loan had the effect of transferring estate assets to the favored beneficiaries. *Id.* at 62–63. The district court dismissed

Glassie's suit pursuant to the probate exception, and the First
Circuit reversed. *Id.* at 71.

Rejecting the executor's argument that the probate
exception applied because the federal action would require
an accounting of the estate, the First Circuit held that "the
probate exception does not apply merely because a judgment
in the federal-court action 'may be intertwined with and
binding on . . . state proceedings.'" *Id.* at 67 (alterations in
original) (quoting *Jimenez v. Rodriguez-Pagan*, 597 F.3d 18,
24 (1st Cir. 2010)).  "[A]ny damages calculation will not
preclude the probate court from approving a final
accounting, nor will it determine the distribution Georgia
will receive from the estate itself." *Id.*

Likewise, in *Chevalier v. Estate of Barnhart*, 803 F.3d
789 (6th Cir. 2015), Chevalier and Barnhart were married,
and "[t]hroughout the course of their marriage, Chevalier
made a series of loans to Barnhart, which Barnhart never
repaid." *Id.* at 791.  Chevalier sued in federal court alleging
contract and tort claims to recover her loans. *Id.*  The district
court dismissed Chevalier's action pursuant to the
"domestic-relations exception to federal diversity
jurisdiction" which "deprives federal courts of jurisdiction
to adjudicate 'only cases involving the issuance of a divorce,
alimony, or child custody decree.'" *Id.* at 791–92 (quoting
*Ankenbrandt v. Richards*, 504 U.S. 689, 704 (1992)); *see
also Marshall*, 547 U.S. at 308 (describing the probate
exception as "kin to the domestic relations exception").
Chevalier appealed, and while the appeal was pending,
Barnhart died. *Chevalier*, 803 F.3d at 792.  The Sixth Circuit
reversed the district court, holding that neither the domestic-
relations exception nor the probate exception stripped the
federal court of jurisdiction over Chevalier's claims. *Id.* at
804.

In addressing the applicability of the probate exception, the Sixth Circuit used the test relevant here: "whether Chevalier seeks to reach the *res* over which the state court had custody." *Id.* at 801 (cleaned up). It held she did not, as "[h]er first four claims—for breach of contract, default, unjust enrichment, and fraud—are *in personam* actions." *Id.* at 802.

Finally, in *Lefkowitz v. Bank of New York*, 528 F.3d 102, 104 (2d Cir. 2007), the plaintiff asserted claims against estate administrators for the administrators' own alleged wrongful conduct. Unlike here, no claims were based on the actions of the decedent. The district court, relying on law preceding *Marshall*, held that the claims were barred by the probate exception. *Id.* at 106–07. The Second Circuit, based on *Marshall*, reversed in part, distinguishing claims including breach of fiduciary duty, aiding and abetting breach of fiduciary duty, fraudulent misrepresentation, and fraudulent concealment—which it held were not barred by the probate exception—from claims including conversion, unjust enrichment, and payment for monies allegedly owed, specific performance, and declaratory relief confirming entitlement to estate assets, which it held were barred. *Id.* at 104, 107. The court reasoned that in the former category of claims, the plaintiff "s[ought] damages from Defendants personally rather than assets or distributions from [an] estate." *Id.* at 107–08. In the latter category of claims, however, the plaintiff sought, "in essence, disgorgement of funds that remain under the control of the Probate Court" and that she was attempting "to mask in claims for federal relief her complaints about the maladministration of her parent's estates, which have been proceeding in probate courts." *Id.* at 107.

To the extent that *Lefkowitz* suggests that the prospect of a damages award paid by an estate itself rather than the personal representative of an estate deprives the federal courts of jurisdiction, *see id.* at 107–08, that suggestion is incompatible with *Marshall* and *Goncalves* for the reasons explained above.[12]   The question under *Marshall* and *Goncalves* is not whether a money judgment would need to come from an estate; it is whether a case requires a court to annul or probate a will, administer an estate, or assume in rem jurisdiction over property within the custody of a state probate court.  *Marshall*, 547 U.S. at 311–12; *Goncalves*, 865 F.3d at 1252.  This case does not require the court to perform any such impermissible function.

## II.

The Estate also moved to dismiss for lack of personal jurisdiction.  The district court did not reach this argument, but the Estate advances it on appeal as an alternative ground for affirmance.  As "[w]e may affirm the district court's dismissal on any ground that is supported by the record, whether or not the district court relied on the same ground," we exercise our discretion to reach this argument.[13]

---

[12] The Eleventh Circuit's opinion in *Fisher v. PNC Bank*, 2 F.4th 1352 (11th Cir. 2021), likewise suggests that federal jurisdiction would be inappropriate were damages to be paid by an estate rather than by a defendant in its individual capacity.  Like the claims the Second Circuit held were not barred in *Lefkowitz*, the claims in *Fisher* sought damages from a defendant personally, rather than from an estate.  *Id.* at 1357.  To the extent that *Fisher* implies that seeking damages from an estate would be inconsistent with federal jurisdiction, it is similarly at odds with *Marshall* and *Goncalves*.

[13] The Estate submitted declarations and affidavits to the district court in support of its motion to dismiss.  Silk submitted a declaration in

*Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1121 (9th Cir. 2013).

During the relevant period, Silk lived in California and Bond lived in Maryland. Bond did not travel to California to do business with Silk; the two instead conducted business by phone, email, fax, and mail. Under the agreements at issue here, Silk supervised the liquid portion of Bond's investment portfolio from California, and when Silk worked for Bond, he did so primarily from California. According to Silk, Bond paid into Silk's California bank account for his work, and Bond mailed Silk "substantial paper copies of his portfolio" for review "every month until he died." Silk also declares that he "retained California counsel on behalf of Bond in connection with some of his investments," that Bond "sometimes sent his son" to California to discuss business on his behalf with Silk, and that at one particular meeting between Silk and Bond's son in 2013, the two

---

opposition. The Estate suggests in its briefing that some facts are disputed. When a district court acts on a defendant's motion to dismiss without first holding an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdiction to avoid the defendant's motion to dismiss." *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd*., 328 F.3d 1122, 1129 (9th Cir. 2003). And "conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists." *Id.* (internal quotation marks omitted). We conclude that Silk has made a prima facie showing of personal jurisdiction and leave any further proceedings on this issue to the district court.

discussed "sensitive aspects" of Silk's tax- and estate-planning services.[14]

As "California's long-arm statute allows the exercise of personal jurisdiction to the full extent permissible under the U.S. Constitution," *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014), the question is whether the Estate had "minimum contacts" with California "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks and citation omitted). The answer is yes. Our court has "set forth a three-part test, derived from the Due Process Clause, that examines the defendant's purposeful conduct towards the forum, the relation between his conduct and the cause of action asserted against him, and the reasonableness of the exercise of jurisdiction." *S.E.C. v. Ross*, 504 F.3d 1130, 1138 (9th Cir. 2007).

As discussed above, during his life, Frank Bond[15] established purposeful contact with California via his contracts with Silk, then a California resident,[16] for services.

---

[14] The Estate disputes this allegation, stating that when Baron Bond met with Silk in California, they merely "discussed shared interests including weight lifting, science fiction, and classical liberal political philosophy and religion."

[15] A court may exercise personal jurisdiction over the representatives of an estate if it could have done so over the decedent. *Mitsui Manufacturers Bank v. Tucker*, 199 Cal. Rptr. 517, 519 (Ct. App. 1984).

[16] Silk declares that he lived in California during the relevant time period, but Howard Miller, one of the co-personal representatives of the Estate, declares that Silk lived in Maryland from 1991 to 1995. As factual conflicts from affidavits are resolved in the plaintiff's favor at this stage,

In doing so, Bond created a multi-year business relationship "that envisioned continuing and wide-reaching contacts" with Silk in California. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 480 (1985). Moreover, by contracting with Silk, Bond created "continuing obligations" to Silk. *See Hirsch v. Blue Cross, Blue Shield of Kansas City*, 800 F.2d 1474, 1478 (9th Cir. 1986). That conduct gives rise to this action: When Silk performed financial services for Bond he did so from California, and the relevant contracts list Silk's California address. Claims arising out of the alleged breach of those contracts therefore arise out of forum-based activities. *See id.* at 1480. Finally, even though Bond did not travel to California to conduct business with Silk, it is still reasonable for California courts to exercise specific personal jurisdiction over his Estate given Bond's retention of a California-based financial advisor who performed all the contracted-for services from California. *Cf. Burger King*, 471 U.S. at 476 (recognizing that the absence of physical contacts does not alone defeat personal jurisdiction, as "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, . . . obviating the need for physical presence within a State").

The Estate contests the exercise of personal jurisdiction. It first argues that "a contract alone does not automatically establish minimum contacts in the plaintiff's home forum." *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008) (citation omitted). While this is true, the contacts here go beyond the "lone transaction for the sale of one item" at issue in *Boschetto*. *Id.* Moreover, *Boschetto* confirms that

---

we treat Silk as a California resident. *See Harris Rutsky*, 328 F.3d at 1129.

business activity constitutes purposeful availment when that activity reaches out and creates "*continuing relationships and obligations*" in the forum state. *Id.* (quoting *Travelers Health Ass'n v. Commonwealth of Va.*, 339 U.S. 643, 647 (1950) (emphasis in original)). The yearslong business relationship between Silk and Bond was significantly more extensive than the purchase of a single item in *Boschetto*. Indeed, the Complaint alleges that Silk worked for Bond for "over two decades." A decades-long business relationship[17] with a California-based service provider clearly constitutes purposeful availment of the privilege of doing business in California. The Estate's arguments that payments for a contract alone do not constitute "the deliberate creation of a substantial connection with California," and that unlike in *Burger King*, the contracts at issue "did not require Bond to subjugate his business affairs to a California operation," do not change our analysis.

The Estate next argues that Silk's focus on his own California ties is misplaced because it is Bond's contacts with California that matter for the purpose of personal jurisdiction. This misses the mark. No party contends that California has general personal jurisdiction over the Estate by virtue of Bond establishing residence or property ownership in California. Instead, Silk argues that Bond availed himself of Silk's California-based services in a manner "sufficient to establish the required minimum

---

[17] While the Estate argues that Silk's suit is for "two discrete contracts for tax planning allegedly performed in 1998 and 1999," this ignores that Count One of the Complaint alleges breach of contract for the private variable annuity incentive fee Silk alleges he earned from 1991 to 1993. The Complaint also alleges decades of work related to, but not constituting, the relevant breaches of contract.

contacts for specific personal jurisdiction." Silk's focus on his own California address and bank account are relevant because it is Bond's contacts with him that support the exercise of personal jurisdiction.

Finally, the Estate argues that even if Silk has made a prima facie case for the exercise of personal jurisdiction in California, exercise of that jurisdiction would be unreasonable. We disagree.

We employ a multi-factor balancing test to determine the reasonableness of exercising personal jurisdiction over a non-resident defendant, assessing:

> 1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts of law between the forum and defendant's home jurisdiction; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and 7) the existence of an alternative forum.

*Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991) (citations omitted). No single factor is dispositive. *Id.* And as we conclude that at this stage of the proceedings, Silk has established that Bond purposefully availed himself of the privilege of doing business in California and that this suit arises out of that contact with California, the Estate "must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Boschetto*, 539 F.3d at 1016 (quoting *Burger King*, 471 U.S. 476–78).

The Estate has not presented a compelling case that the exercise of jurisdiction would be unreasonable.  *See Caruth v. Int'l Psychoanalytical Ass'n*, 59 F.3d 126, 129 (9th Cir. 1995) ("Neither party is clearly favored in the final balance. However, given the closeness of the factors, we conclude that [defendant] has not presented a 'compelling case' that exercising jurisdiction over it would be unreasonable.").

First, Bond's interjection into California is analogous to his purposeful availment and, accordingly, the first factor favors jurisdiction.  *See Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988).  Next, although defending a lawsuit in California is surely burdensome to the Estate, the Estate has not "presented evidence that the inconvenience is so great as to constitute a deprivation of due process," and so this factor just "barely" weighs against the exercise of personal jurisdiction.  *Freestream Aircraft (Bermuda) Ltd. v. Aero L. Grp.*, 905 F.3d 597, 608 (9th Cir. 2018) (internal quotation marks omitted).

The Estate speculates that Silk filed in California instead of Maryland to avoid Maryland's "Dead Man's Act," which prevents interested parties in civil actions from testifying about conversations or transactions with the deceased.  Even if true, and even if California wouldn't apply a similar rule, this does not by itself render the exercise of jurisdiction in California unreasonable.  Different forums have different rules, and parties often pick the one they perceive to be most favorable to them.  We reject the Estate's contention that exercising jurisdiction would conflict with Maryland's "sovereign prerogatives," because, as we have previously observed, "any clash between a forum's law with the fundamental substantive social policies of another state may be resolved through choice of law rules, not jurisdiction." *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*,

784 F.2d 1392, 1401–02 (9th Cir. 1986). The fact that "California might apply its own law against the [Estate] should not complicate or distort the jurisdictional inquiry." *Id.* at 1402.

As for the remaining factors, although California has an interest in providing an effective means of redress for its residents, Silk is no longer a California resident. Efficient judicial resolution of the controversy is neutral, as it focuses on the location of the evidence and witnesses, *see Harris Rutsky*, 328 F.3d at 1133, which are split between Nevada and Maryland. And, in any event, "this factor is no longer weighed heavily given the modern advances in communication and transportation." *Id.* (internal quotation marks and citation omitted). California also serves Silk's interest in convenient and effective relief: Even though Silk now lives in Nevada, California is a more convenient forum for him than Maryland, and he was a California resident when he entered the contracts and did the work at issue in this dispute. Finally, "[w]hether another reasonable forum exists becomes an issue only when the forum state is shown to be unreasonable," and the Estate has made no such showing here. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1080 (9th Cir. 2011) (quoting *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 929 n.19 (9th Cir. 2011), *rev'd on other grounds*, 571 U.S. 117 (2014)).

For the foregoing reasons, we hold that Silk has made out a prima facie case of personal jurisdiction.

## CONCLUSION

Because federal jurisdiction over this case is not barred by the probate exception, and because at this stage of the proceedings Silk has made a prima facie case for personal jurisdiction over the Estate, we reverse the judgment of the

district court and remand for further proceedings.

**REVERSED and REMANDED.**