**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| ERICA DAVIS, as Personal Representative of the Estate of Andrew Dale Davis, deceased, and minor children, JC, minor child, SD, minor child; MICHAEL M. MASCHMEYER, as Personal Representative of the Estate of R. Wayne Estopinal, deceased; JAMES JOHNSON, individually and as Independent Co-Administrators of the Estate of Sandra Johnson, deceased; BRADLEY HERMAN, individually and as Independent Co-Administrators of the Estate of Sandra Johnson, deceased, | No. 22-35099 <br><br> D.C. No. 2:20-cv-00536-BLW |
| *Plaintiffs-Appellants,* | |
| v. | OPINION |
| CRANFIELD AEROSPACE SOLUTIONS, LIMITED, | |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted November 9, 2022
Portland, Oregon

Filed June 23, 2023

Before:  Patrick J. Bumatay and Gabriel P. Sanchez, Circuit Judges, and M. Miller Baker,[*] International Trade Judge.

Opinion by Judge Bumatay;
Partial Dissent by Judge Baker

## SUMMARY[**]

### Personal Jurisdiction

The panel affirmed the Idaho federal district court's judgment dismissing, for lack of personal jurisdiction over an English corporation, a diversity action brought by plaintiffs from Louisiana and Indiana for an accident that occurred in Indiana.

Representatives for the three decedents of a plane crash that occurred in Indiana brought a wrongful death and product liability suit against Cranfield Aerospace Solutions, Limited, in the District of Idaho.  The representatives for two decedents are residents of Indiana, while the third decedent's representatives reside in Louisiana.  Cranfield is

---

[*] The Honorable M. Miller Baker, Judge for the United States Court of International Trade, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

incorporated in and has its principal place of business in England. Appellants alleged that a load alleviation system, the Tamarack Active Winglet Load System—trademarked as the ATLAS system—caused the plane crash. Cranfield helped Tamarack obtain the Federal Aviation Administration supplemental type certification for the ATLAS system.

Idaho's long-arm statute authorizes the exercise of all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution.

Only specific jurisdiction is at issue in this case. This court uses a three-part test to determine whether specific jurisdiction exists: (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

The panel held when considering specific jurisdiction under the first prong, courts should comprehensively evaluate the extent of the defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims—which may mean looking at both purposeful availment and purposeful direction. The panel held that under either approach, jurisdiction over Cranfield in Idaho was lacking. The purposeful direction test cannot support jurisdiction here because Appellants failed to allege that Cranfield injured them in Idaho. The panel agreed with the

district court that Appellants failed to establish that Cranfield purposefully availed itself of the benefits and protections of Idaho. While Tamarack was an Idaho resident, there was no evidence that Cranfield sought out Tamarack in Idaho or benefitted from Tamarack's residence in Idaho. Neither the contract's negotiations, terms, nor contemplated consequences established that Cranfield formed a substantial connection with Idaho. The panel concluded that the two trips by Cranfield employees to Idaho were too attenuated to establish minimum contacts with the State. None of Cranfield's actual course of dealings in Idaho was so substantial or widespread that it reflected Cranfield's attempt to gain the "benefits and protections" of the forum state.

Because Appellants' allegations failed to establish that Cranfield had sufficient minimum contacts with Idaho, the panel declined to proceed to the remaining two prongs of the specific jurisdiction test, and held that the district court properly declined to exercise jurisdiction over Cranfield.

Judge Baker dissented in part. He joined Parts I, II.A., II.B. except for its final sentence, and II.C. of the panel's opinion. He parted company, however, with the majority's conclusion that Plaintiffs did not demonstrate that the U.K.-based Cranfield Aerospace Solutions, Ltd., purposefully availed itself of the forum state, Idaho. In his view, Plaintiffs lopsidedly carried that burden by showing that Cranfield undertook continuing obligations entailing substantial activity directed toward Tamarack Aerospace Group, Inc., in Idaho for over six years.

**COUNSEL**

Michael S. McArdle (argued) and Thomas P. Routh, Nolan Law Group, Chicago, Illinois; David Katzman, Bruce Lampert, and Bradley Stoll, Katzman Lampert & Stoll PLLC, Bloomfield, Colorado; Joseph J. Slama, Krupnick Campbell Malone Buser Slama Hancock PA, Fort Lauderdale, Florida; J. Charles Hepworth, Hepworth Holzer LLP, Boise, Idaho; for Plaintiffs-Appellants.

Gregory F. Miller (argued) and V. L. Woolston, Perkins Coie LLP, Seattle, Washington; Karl J. Worsham, Perkins Coie LLP, Phoenix, Arizona; Richard C. Boardman, Perkins Coie LLP, Boise, Idaho; for Defendant-Appellee.

## OPINION

BUMATAY, Circuit Judge:

This case asks whether a federal court in Idaho may exercise personal jurisdiction over an English corporation in an action brought by plaintiffs from Louisiana and Indiana for an accident that occurred in Indiana. Because this case involves an out-of-state accident, out-of-state plaintiffs, and an out-of-state defendant with no minimum contacts with the state, we say no.

### I.

In November 2018, a Cessna Model 525 corporate jet tried to fly from Sellersburg, Indiana, to Chicago, Illinois. It never made it to Chicago. It crashed a few minutes after takeoff in Clark County, Indiana. The pilot of the plane, Andrew Davis, and the two passengers, R. Wayne Estopinal and Sandra Johnson, were killed instantly.

Representatives for the three decedents brought this wrongful death and product liability suit against Cranfield Aerospace Solutions, LLC, in the District of Idaho. These representatives include Erica Davis for her late husband's estate and for her minor children; Michael Maschmeyer for the Estopinal estate; and James Johnson and Bradley Herman for the Johnson estate (collectively, the "Appellants"). The representatives for Davis and Estopinal are residents of Indiana, while Johnson's representatives reside in Louisiana. Cranfield is incorporated in and has its principal place of business in England.

Appellants allege that a load alleviation system, the Tamarack Active Winglet Load System—trademarked as the ATLAS system—caused the plane crash. They believe

that the ATLAS system's defective design caused the Cessna to deviate from its flight path and hit trees and the ground in Indiana. Tamarack Aerospace Group, Inc., a Washington State corporation with its principal place of business in Idaho, manufactured and installed the ATLAS system on the Cessna in May 2018.

But before being allowed to install the ATLAS system on planes within the United States, Tamarack needed a special certification from the Federal Aviation Administration ("FAA")—known as a supplemental type certification. This certification allows the holder to modify airplanes from their original design. This is where Cranfield comes into the picture. Cranfield helped Tamarack obtain the FAA supplemental type certification.

Tamarack and Cranfield had a preexisting relationship. After Tamarack designed the ATLAS system, it asked Cranfield for help in obtaining a supplemental type certification from the European equivalent of the FAA—the European Aviation Safety Agency ("EASA"). In 2013, Tamarack contracted Cranfield to provide services to attain an EASA certificate for the ATLAS system. Cranfield oversaw and provided technical assistance for the process to obtain the certification. Cranfield acted as the point of contact between the EASA and Tamarack. Cranfield successfully obtained the EASA certificate for Tamarack in 2015.

A year into the contract, Tamarack asked Cranfield to expand its scope to include obtaining an FAA certificate for the ATLAS system. Once again, Cranfield acted as the primary interface with the agency. Cranfield was again successful—obtaining the FAA certificate on behalf of Tamarack in 2016. Tamarack then installed the ATLAS

winglet system on the Cessna in 2018. At the time of the crash, Cranfield still held the FAA and EASA certificates for Tamarack. After the crash, in 2019, Cranfield transferred both certificates to Tamarack.

Appellants first sued Tamarack and Cranfield in the Eastern District of Washington, alleging both companies were liable for the crash under Washington's Product Liability Act. Cranfield moved to dismiss for lack of personal jurisdiction, and Appellants conceded that jurisdiction was lacking. Cranfield was dismissed from the action, but the litigation against Tamarack continued. That case is still pending.

In November 2020, Appellants brought this diversity action against Cranfield in the District of Idaho under 28 U.S.C. § 1332(a). Appellants' complaint alleges three causes of action under Idaho state law: (1) liability under Idaho's Product Liability Reform Act; (2) negligence; and (3) willful and reckless misconduct. Cranfield again moved to dismiss for lack of jurisdiction. After permitting jurisdictional discovery, the district court granted Cranfield's motion to dismiss for lack of personal jurisdiction. The court ruled that Appellants could not establish specific jurisdiction over Cranfield.

This appeal followed, which we review *de novo*. *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020).

## II.

## A.

## Personal Jurisdiction: General and Specific

The central question here is whether a federal court sitting in Idaho can exercise personal jurisdiction over Cranfield, an English corporation. To establish federal jurisdiction over a nonresident defendant in a diversity suit, we look to both state jurisdictional rules and the constitutional principles of due process. *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). We first look to state law to see how far the state extends the bounds of its courts' jurisdiction. *Id*. We then make sure that the exercise of jurisdiction would "comport[] with the limits imposed by federal due process." *Id*.

In this case, Idaho's long-arm statute authorizes the exercise of "all the jurisdiction available to the State of Idaho under the due process clause of the United States Constitution." *Lake v. Lake*, 817 F.2d 1416, 1420 (9th Cir. 1987) (citing *Doggett v. Elecs. Corp. of Am.*, 93 Idaho 26, 30 (1969)); *see also* Idaho Code § 5-514. So, for our purposes, jurisdiction under state law and due process are coextensive.

Whether the exercise of jurisdiction satisfies due process turns on "the nature and extent of the defendant's relationship to the forum State." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (simplified). "Since *International Shoe*, the rule has been that a state court can exercise personal jurisdiction over a defendant if the defendant has 'minimum contacts' with the forum—which means that the contacts must be 'such that the maintenance of the suit does not offend 'traditional notions

of fair play and substantial justice.'" *Id*. at 1032 (Alito, J., concurring) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). Given this focus on forum state contacts, jurisdiction comes in two forms: general jurisdiction and specific jurisdiction. *Id*. at 1024.

General jurisdiction—or "all-purpose" jurisdiction—comes into play when a defendant is "essentially at home" in the forum state. *Id*. For corporations, this type of extensive contact generally means the company's place of incorporation and its principal place of business. *Id*. Such jurisdiction extends over "any and all claims" against the defendant concerning "events and conduct anywhere in the world." *Id*.

Specific jurisdiction, on the other hand, permits jurisdiction over a defendant "less intimately connected" with a forum state. *Id.* To assert specific jurisdiction, the defendant must have "take[n] some act by which it purposefully avails itself of the privilege of conducting activities within the forum State." *Id*. (simplified). But given the more limited contacts with the forum state, this type of jurisdiction is "case-linked," only covering a "narrower class of claims." *Id*. To comply with due process, the plaintiff's claims "must arise out of or relate to the defendant's contacts with the forum." *Id*. at 1025 (simplified).

Our court uses a three-part test to determine whether specific jurisdiction exists:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by

> which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004) (quoting *Lake*, 817 F.2d at 1421). The plaintiff bears the burden of meeting the first two prongs while the defendant shoulders the burden on the final prong. *Id.* All three prongs must be met to exercise personal jurisdiction over the defendant. *Id.*

Only specific jurisdiction is at issue here.

## B.

### Purposeful Direction v. Purposeful Availment

Before turning to application of the specific-jurisdiction test, we start with a word about the first prong—the "purposeful availment" prong. In the past, we've suggested that we evaluate this prong "somewhat differently" depending on whether the case involves tort or contract claims. *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1205–06 (9th Cir. 2006) (en banc). As we've said, the prong incorporates two distinct concepts—"purposeful direction" and "purposeful availment." *Id.*; *see also Schwarzenegger*, 374 F.3d at 802. The "purposeful direction" test "typically" applies to tort

claims while the "purposeful availment" test "typically" applies to contract cases. *See Yahoo! Inc.*, 433 F.3d at 1206; *see also Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015) (stating that we "generally" apply purposeful availment to claims sounding in contract). While our precedent mentions what "typically" happens, we have never held that this line is a hard-and-fast rule. Rather, "our cases do not impose a rigid dividing line between these two types of claims." *Glob. Commodities*, 972 F.3d at 1107. Indeed, the first prong "may be satisfied by purposeful availment," "by purposeful direction," or "by some combination thereof." *Yahoo! Inc.*, 433 F.3d at 1206.

After all, a "rigid dividing line" doesn't serve the purposes of due process. "[B]oth purposeful availment and purposeful direction ask whether defendants have voluntarily derived some benefit from their interstate activities such that they will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Glob. Commodities*, 972 F.3d at 1107 (simplified). So there's no need to adhere to an iron-clad doctrinal dichotomy to analyze specific jurisdiction. Rather, when considering specific jurisdiction, courts should comprehensively evaluate the extent of the defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims—which may mean looking at both purposeful availment and purposeful direction.

Thus, to the extent Cranfield argues that we should only review Appellants' tort claims under the purposeful direction test, we disagree. We think it appropriate to look at both approaches in determining jurisdiction over Cranfield. But under either approach, jurisdiction over Cranfield in Idaho is lacking.

## C.

### No Purposeful Direction in Idaho

Start with the purposeful direction test. We evaluate purposeful direction under the three-part "effects" test from *Calder v. Jones*, 465 U.S. 783, 789–90 (1984): the defendant must have allegedly "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Yahoo!*, 433 F.3d at 1206 (quoting *Schwarzenegger*, 374 F.3d at 803). An action may be directed at a forum state even if it occurred elsewhere. *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017). This analysis is driven by the defendant's contacts with the forum state—not the plaintiff's or other parties' forum connections. *Walden v. Fiore*, 571 U.S. 277, 289 (2014); *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 265 (2017).

The purposeful direction test cannot support jurisdiction here because Appellants fail to allege that Cranfield injured them in Idaho. "Harm suffered in the forum state is a necessary element in establishing purposeful direction." *Morrill*, 873 F.3d at 1144. As alleged, the harms to Appellants occurred in Indiana, where the plane crash killed their loved ones, or in Indiana and Louisiana, where they resided when the crash occurred. Under the purposeful direction test, haling Cranfield into court in Idaho for a harm that was suffered elsewhere does not satisfy due process. Because this lack of forum-state harm is dispositive, we need not address the other elements of the purposeful direction test.

## D.

## No Purposeful Availment in Idaho

While closer, purposeful availment leads to the same result. To establish purposeful availment, we look at a defendant's "entire course of dealing" with the forum state—"not solely the particular contract or tortious conduct giving rise to [a plaintiff's] claim." *Glob. Commodities*, 972 F.3d at 1108. It exists when a defendant's dealings with a state establishes a "quid pro quo"—where the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," and in return "submit[s] to the burdens of litigation" in the State. *Schwarzenegger*, 374 F.3d at 802 (simplified). In other words, we examine whether the defendant "deliberately reached out beyond [its] home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Yamashita v. LG Chem, Ltd*., 62 F.4th 496, 503 (9th Cir. 2023) (simplified). The "unilateral activity" of another party does not meet this standard. *Id*. Purposeful availment can be established by a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985).

Looking at these factors, we agree with the district court that Appellants failed to establish that Cranfield purposefully availed itself of the benefits and protections of Idaho. While Tamarack is an Idaho resident, there's no evidence that Cranfield sought out Tamarack in Idaho or benefitted from Tamarack's residence in Idaho. Neither the contract's negotiations, terms, nor contemplated consequences establish that Cranfield formed a substantial

connection with Idaho. And while the course of dealings show that Cranfield employees entered Idaho several times, those transitory trips into the forum state do not sufficiently reflect purposeful availment.

*Contract Negotiations.* At the time that Tamarack contacted Cranfield about the ATLAS Winglet project in early 2012, Cranfield had no offices, facilities, employees, or agents in the United States. It never advertised or marketed services in Idaho. Appellants do not allege that Cranfield had any Idaho contacts before its contract with Tamarack. And Cranfield did not solicit the business with Tamarack. Instead, Tamarack initiated contact with Cranfield by phone and email. Negotiations between the two parties continued remotely, although there was one in-person meeting in England, Cranfield's headquarters. During negotiations, Cranfield let Tamarack know that all Cranfield staff working on the project would be based in the United Kingdom. So nothing in the contract negotiation reflects Cranfield's intent to avail itself of Idaho's laws. *See Sher v. Johnson*, 911 F.2d 1357, 1363 (9th Cir. 1990) (finding no purposeful availment in the course of negotiations when defendant "is solicited in its home state and takes no affirmative action to promote business within the forum state").

*Contract Terms*. None of the contract terms invoke the laws of Idaho. Instead, by its terms, New York law governs the contract's enforcement and interpretation. The agreement also selects New York as its choice of forum. The closest the contract gets to referring to Idaho is that Cranfield may "witness" any tests associated with the project and Cranfield will have access to Tamarack's facility "as and when necessary." This suggests some contact with Idaho given that Tamarack's facility is in Idaho, but the contract is

permissive—not mandatory—and does not specify whether Cranfield must "witness" any tests in person. Given that the overall purpose of the contract terms was to obtain a certification from European aviation authorities and the FAA, which is headquartered in Washington, D.C., we think the contract terms count against finding purposeful availment in Idaho. *See Burger King*, 471 U.S. at 478 (entering a contract with a forum state resident is not enough in itself to establish minimum contacts).

*Contemplated Consequences*. The contemplated consequences of the contract do not change the analysis. Nothing in the contract's contemplated consequences suggests that Cranfield sought to benefit from Idaho's laws. Once again, the contract contemplated that Cranfield would provide technical assistance in obtaining certifications from the EASA and the FAA and serve as Tamarack's main representative to those agencies. Even while delegating those functions to Cranfield, Tamarack remained responsible for developing and coordinating all engineering and certification testing. The strongest fact for Appellants is that the contract contemplated that Cranfield would hold the EASA and FAA supplemental type certification on behalf of Tamarack. Indeed, Cranfield held the certifications on behalf of Tamarack at the time of the crash. But we do not think such a legal obligation in itself establishes purposeful availment in Idaho. *Cf. Sher*, 911 F.2d at 1362 ("normal incidents of [legal] representation" of an in-forum client do not by themselves establish minimum contacts). This is especially true when Tamarack remained responsible for any modifications to the FAA certification and any testing or analysis necessary for the modifications.

*Actual Course of Dealings*. This leaves Cranfield's actual course of dealing with Tamarack in Idaho, which

presents a somewhat closer question.  Appellants allege that Cranfield employees engaged in several telephone calls, emails, and other correspondence with individuals in Idaho related to the design and safety aspects of Tamarack's ATLAS system.  While remaining in England, Cranfield employees provided Tamarack technical advice and assistance and helped them develop procedures and analysis to obtain the EASA and FAA certifications.  Throughout each of these activities, Cranfield and its employees worked in the United Kingdom.  In return, Tamarack compensated Cranfield from Idaho.

We have explained that "the fact that a contract envisions one party discharging his obligations in the forum state cannot, standing alone, justify the exercise of jurisdiction over another party to the contract."  *Picot*, 780 F.3d at 1213.  And remote actions taken to service a contract in the forum state seldom lead to purposeful availment by themselves. *See Sher*, 911 F.2d at 1362 (explaining that, without more, out-of-state contacts by mail and phone and payments sent from forum state did not establish "the deliberate creation of a 'substantial connection'" with the forum state).  Thus, Cranfield's remote work on behalf of Tamarack's ATLAS project does not, without more, establish purposeful availment.

But Appellants don't rely solely on Cranfield's remote work.  Besides Cranfield's remote activities, Appellants point to two trips by Cranfield employees to Tamarack's Idaho facility as part of the contract.  First, after the contract was executed, Cranfield's head of design traveled to Idaho in 2013.  During this three-day trip, he met with Tamarack's developers of the ATLAS winglet system, observed a working prototype, and held several meetings with Tamarack engineers to learn more about the system.  He also

spent time going through the regulations necessary for obtaining a European certificate for the ATLAS system and worked with Tamarack to plan the certification process.

Appellants also highlight a 2017 trip by Cranfield's chief stress engineer to observe a "critical stage" of testing of the ATLAS system. The purpose of the week-long Idaho visit was to determine whether Tamarack's test protocols and test results complied with the EASA and FAA regulations. The Cranfield engineer's role was to later validate the test reports while in the United Kingdom or in Idaho, but he also had the authority to request a retest while in Idaho if something had gone wrong.

"While physical entry into the State is certainly a relevant contact, a defendant's transitory presence will support jurisdiction only if it was meaningful enough to create a substantial connection with the forum State." *Picot*, 780 F.3d at 1213 (simplified). In *Picot*, we examined whether an out-of-state defendant's forays into the forum state established purposeful availment. There, the defendant made two trips to California to assist with presentations given to potential clients at the plaintiffs' request and expense. *Id.* Both trips lasted about two weeks, but the defendant's role in the presentations was "relatively small." *Id.* We declined to find a substantial connection with California under those facts. We determined that the two trips had "no special place" in the performance of the plaintiffs' contract "as a whole." *Id.* They were not part of the initial agreement between the parties. *Id.* And the defendant had performed the "bulk of his efforts" out-of-state and met with clients and plaintiffs outside of California. *Id.* At most, we held, the trips were "random, fortuitous, or attenuated" contacts with the forum state. *Id.* And we reached the same conclusion in other cases. *See Sher*, 911

F.2d at 1363; *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 271 (9th Cir. 1995).

Our recent decision in *Silk v. Bond*, 65 F.4th 445 (9th Cir. 2023), does not change our analysis. While *Silk* shows that physical travel to the forum state may not be necessary to establish purposeful availment, it illustrates the level of substantial connections under a contractual relationship that may suffice. *Id.* at 456–57. There, the defendant sought out a contractual relationship in the forum state that would require all related work to take place in that state. *Id.* at 457. The contract referenced the forum state and the defendant paid into forum-state bank accounts, mailed paper copies of relevant documents to the forum state each month for two decades, and at times sent family members to the forum state for contract-related meetings on his behalf. *Id.* at 456. In comparison, Cranfield's interactions with Idaho are far more random, fortuitous, and attenuated, making this case more like *Picot* than *Silk*.

Given this precedent, we conclude that the two trips by Cranfield employees to Idaho were too attenuated to establish minimum contacts with the State. As in *Picot*, the employees traveled at Tamarack's request and expense, and the trips did not suggest a "special place" in Cranfield's years-long performance of its contract with Tamarack. *Picot*, 780 F.3d at 1213. While observing testing of the ATLAS system is important, the record shows that approval of the testing could have occurred in the United Kingdom. And it is undisputed that the bulk of Cranfield's work under the contract took place in that country.

So none of Cranfield's actual course of dealings in Idaho was so substantial or widespread that it reflects Cranfield's

attempt to gain the "benefits and protections" of the forum state.

***

Because Appellants' allegations fail to establish that Cranfield had sufficient minimum contacts with Idaho, we decline to proceed to the remaining two prongs of the specific jurisdiction test.

In one last try, Appellants ask us to find specific jurisdiction based on public policy concerns. They argue that the United States' interest in regulating and promoting safety in the aviation industry favors asserting jurisdiction over Cranfield here. Without Cranfield's actions to obtain the FAA certificate here, Appellants contend that the plane crash would not have happened. While we are mindful that this appeal stems from tragic circumstances, that does not give us license to dispense with constitutional requirements.

## III.

Because this case involves out-of-state conduct by an out-of-state defendant and an out-of-state harm, the district court properly declined to exercise jurisdiction over Cranfield.

**AFFIRMED.**

BAKER, Judge, dissenting in part:

I join Parts I, II.A., II.B. except for its final sentence, and II.C. of the panel's opinion. I part company, however, with the majority's conclusion that Plaintiffs did not demonstrate that the U.K.-based Cranfield Aerospace Solutions, Ltd., purposefully availed itself of the forum state, Idaho. In my view, they lopsidedly carried that burden by showing that Cranfield undertook continuing obligations entailing substantial activity directed toward Tamarack Aerospace Group, Inc., in Idaho for over six years.

I

To constitute "purposeful availment," the defendant's contacts with the forum state must "proximately result from actions by the defendant himself that create a substantial connection with" that state. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (cleaned up). The question is whether "the defendant's *conduct* . . . form[s] the necessary connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 285 (2014) (emphasis added). Because "an individual's contract with an out-of-state party alone" cannot subject the individual to the jurisdiction of the other party's home state, *Burger King*, 471 U.S. at 478 (emphasis removed), when the defendant has a contractual relationship with a forum resident, a court must look to "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Id.* at 479. Essential to this inquiry is whether the contract creates "continuing obligations between [the defendant] and residents of the forum." *Id.* at 476 (cleaned up).

In our cases applying *Burger King* over the last 38 years, a clear principle emerges: A nonresident purposefully avails

itself of the forum state when it undertakes (1) continuing obligations (2) entailing some meaningful activity directed toward or producing effects in the forum. *See, e.g.*, *Silk v. Bond*, 65 F.4th 445, 457 (9th Cir. 2023) (holding that a nonresident who engaged a California financial planner in "a multi-year business relationship" purposefully availed himself of that state by "creat[ing] 'continuing [payment] obligations' " to the planner) (citing *Hirsch v. Blue Cross, Blue Shield of Kan. City*, 800 F.2d 1474, 1478 (9th Cir. 1986)), *pet. for cert. filed*, No. 22-1167 (U.S. June 2, 2023); *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1108 (9th Cir. 2020) (Honduras importer purposefully availed itself of the California forum by " 'creat[ing] continuing relationships and obligations with citizens of' " that state "over several years" through "payments on . . . contracts" for sales of grain) (quoting *Burger King*, 471 U.S. at 473); *Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 289 (9th Cir. 1997) (nonresident licensee of California television producer purposefully availed itself of that state by creating "continuing obligations" to pay producer) (quoting *Burger King*, 471 U.S. at 476), *rev'd on other grounds sub nom. Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998); *Ballard v. Savage*, 65 F.3d 1495, 1498 (9th Cir. 1995) (Austrian bank merely holding accounts of American citizens satisfied purposeful availment by its "continuing obligations to forum residents"); *Roth v. Garcia Marquez*, 942 F.2d 617, 621–22 (9th Cir. 1991) (Mexican author's sale of film rights to a California movie producer satisfied purposeful availment by creating "continuing relationships and obligations" that "would have continuing and extensive involvement with the forum," even though the producer solicited the author,

whose visits to the forum were minor); *Sher v. Johnson*, 911 F.2d 1357, 1362–64 (9th Cir. 1990) (Florida law firm representing California clients in Florida litigation purposefully availed itself of California through its partners' travel to the forum, communications with those clients, and encumbrance of the clients' forum property); *Hirsch*, 800 F.2d at 1479–80 (nonresident insurer purposefully availed itself of California forum by accepting "a continuing obligation" to cover insureds in that state, even though the insurer did not solicit the business and never visited the forum); *Haisten v. Grass Valley Med. Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1397–1400 (9th Cir. 1986) (same, with the added fact that the policies were governed by Cayman Islands law).

On the other hand, if a nonresident's contract with a forum resident does "not create any *ongoing* obligations," purposeful availment does not exist. *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008) (emphasis added); *cf. Glob. Commodities*, 972 F.3d at 1108 (observing that a "fleeting" business relationship cannot support purposeful availment).

And even if a nonresident's contract with a forum resident does involve continuing obligations, purposeful availment is not satisfied if the nonresident's obligations do not entail any significant activity toward, or create effects within, that forum. For example, in *Picot v. Weston*, 780 F.3d 1206 (9th Cir. 2015), we held that a nonresident defendant did not purposefully avail himself of the California forum, despite his continuing obligations under an alleged contract with forum residents, because he did not "perform[  ] some type of affirmative conduct *which allows or promotes the transaction of business within the forum state*." *Id*. at 1212 (emphasis added) (quoting *Sher*, 911 F.2d at 1362). His work

under the agreement was performed in Michigan, that work was not directed toward California in any significant way, and his two visits to California were not "envisioned in the initial oral agreement" and "h[e]ld no special place in his performance under the agreement as a whole." *Id*. at 1213.

## II

The majority concludes that neither the contract's negotiations, terms, and contemplated consequences nor the parties' actual course of dealing created a substantial connection with Idaho. I disagree because the 2013 contract created, and the parties' course of dealing reflected, continuing and meaningful Idaho-facing obligations by Cranfield until 2019 when the British company transferred the ATLAS certification to Tamarack.

*Contract Negotiations*. The majority observes that Tamarack solicited Cranfield's services. Opinion at 15. That fact carries little weight, however, when measured against the latter's significant activity directed toward Idaho. In several cases we have found that a defendant purposefully availed itself of the forum by undertaking continuing obligations entailing some activity directed at that jurisdiction, even though the forum resident initiated the business relationship. *See, e.g.*, *Sher*, 911 F.2d at 1362;[1]

---

[1] The majority cites *Sher* as an example of no purposeful availment when a forum resident solicits a business relationship with the defendant. Opinion at 15. But we found purposeful availment in that case, even though forum residents solicited the defendant law firm, because the "entire course of dealing" there created a "significant contact" with the forum through partner visits, communications with the forum residents, and an encumbrance of the clients' forum property to secure payment. *Sher*, 911 F.2d at 1363–64 (cleaned up). As explained below, Cranfield's

*Roth*, 942 F.2d at 621–22; *Hirsch*, 800 F.2d at 1479–80; and *Haisten*, 784 F.2d at 1397–98.

*Contract Terms*. My colleagues conclude that the contract's terms don't support Cranfield's purposeful availment of Idaho. They first point to the contract's choice-of-law and forum-selection clauses, neither of which invokes Idaho. Opinion at 15.

"While [a choice-of-law] provision should not be ignored in determining purposeful availment, it alone will not suffice to block jurisdiction in the [forum state] where other facts indicate that the [defendant] has purposefully directed its activities toward [forum residents]." *Haisten*, 784 F.2d at 1400. Thus, in *Haisten* we held that an insurer purposefully availed itself of the forum when it "directed its activities toward California residents" by covering them, even though the insurance contracts were governed by Cayman Islands law. *Id.*

So if Cranfield continuously directed meaningful activities toward Tamarack in Idaho, that the contract was governed by New York law counts for little. "The issue is personal jurisdiction, not choice of law. It is resolved . . . by considering the acts of the [defendant]" aimed at the forum, *Hanson v. Denckla*, 357 U.S. 235, 254 (1958), and whether those acts "allow[ed] or promote[d] the transaction of business within the forum state," *Picot*, 780 F.3d at 1212.[2]

---

contacts with the Idaho forum are qualitatively stronger than what sufficed for purposeful availment in *Sher*.

[2] In my view, a forum-selection clause has no probative value in determining whether a defendant's contract performance constitutes purposeful availment of the forum for purposes of a third party's claim

The majority then brushes past the contract's substantive terms: "The closest the contract gets to referring to Idaho is that Cranfield may 'witness' any tests" and "have access to Tamarack's facility 'as and when necessary.' " Opinion at 15. According to the majority, this "suggests some contact with Idaho . . . , but the contract is permissive—not mandatory—and does not specify whether Cranfield must 'witness' any tests in person." *Id*. at 15–16.

By only considering contractual terms referring to physical contacts by Cranfield with Idaho, the majority implies that those are the only contacts relevant to purposeful availment. "Jurisdiction," however, "may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King*, 471 U.S. at 476 (emphasis in original). Instead, remote "entry" into a state through "goods, mail, or some other means . . . is certainly a relevant contact." *Walden*, 571 U.S. at 285;[3] *see also Boschetto*, 539 F.3d at 1019 (recognizing that a defendant that never actually enters the state but employs technological "means for establishing regular business with a remote forum" may be subject to personal jurisdiction).

---

arising out of that performance. Although parties "can, through forum selection clauses and the like, easily contract around" personal jurisdiction rules, *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1280 (7th Cir. 1997), such actions do not bind nonparties.

[3] In 1985, a decade before the advent of the modern internet, which exponentially expanded the technological means for remote entry into a jurisdiction, the *Burger King* Court observed that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." 471 U.S. at 476.

My colleagues do not acknowledge the contract's terms mandating continuing contacts with Idaho that Cranfield could perform either in-person or remotely, much less the strong "quality and nature" of those contacts. *Burger King*, 471 U.S. at 480 (quoting *Hanson*, 357 U.S. at 253).

Cranfield's obligations under the first phase of the parties' contract were entirely Idaho-facing. They required it to "*oversee*" Tamarack in their "work together to draft and finalize" two "deliverables," beginning with "a mutually agreeable Certification Plan" for the Idaho company's ATLAS system, followed later by a "mutually agreeable application" for that system, "including all supporting data and documentation" necessary in "Cranfield's professional opinion."[4] In short, the two companies partnered—with Cranfield acting as the senior partner because it would "oversee" the junior partner's work in Idaho—to produce the two "deliverables" necessary to apply for certification of the ATLAS system.

In supervising Tamarack's Idaho work on these deliverables, the contract's terms required Cranfield to "*approv[e]* . . . test schedules and reports provided by Tamarack" (emphasis added), "*define and outline* certification requirements to Tamarack personnel" in Idaho (emphasis added), provide input to Tamarack's preparation of "draft Flight Test Plans and Test Plans" in Idaho and then "*review, check and submit*" those plans (emphasis added), and "ensure" Tamarack's "compliance with all applicable laws and regulations relating to the . . . certification process." Because the contract's terms gave the British company "access to Tamarack's facility as and when necessary,"

---

[4] The Certification Plan was to be included in the supporting data and documentation submitted with the application.

Cranfield could supervise Tamarack remotely and/or in person.

And after the contract's "deliverables" were ready to submit, the contract's second phase required Cranfield to "apply" for certification in its name because Tamarack was not "qualified" to do so. Following aviation officials' approval of the application, the contract's third phase required Cranfield to "hold[    ] and/or maintain[    ]" the certification—a valuable right—"for Tamarack's benefit."

As the certification holder, Cranfield's approval was necessary for Tamarack to install the ATLAS system on any aircraft. *See* 14 C.F.R. § 21.120 (providing that a "supplemental type certificate holder who allows a person to use the supplemental type certificate to alter an aircraft, aircraft engine, or propeller must provide that person with written permission acceptable to the FAA"). The former's remote holding of this certification and approval of the latter's installation of the ATLAS system on the accident aircraft was Idaho-facing much as the remote provision of insurance coverage to forum residents in *Hirsch* and *Haisten* was forum-facing.

In sum, the contract's terms "created a multi-year business relationship 'that envisioned continuing and wide-reaching contacts' " by Cranfield with Tamarack in Idaho. *Silk*, 65 F.4th at 457 (quoting *Burger King*, 471 U.S. at 480); *see also Roth*, 942 F.2d at 622 (purposeful availment satisfied when a contract requires the defendant to have "continuing and extensive involvement with the forum"). Thus, Cranfield "not only could foresee that its actions would have an effect in [Idaho], but also that the effect was 'contemplated and bargained for.' " *Hirsch*, 800 F.2d at 1479 (quoting *Haisten*, 784 F.2d at 1398).

The majority's second reason for dismissing the contract's terms—that their "overall purpose" was to *obtain* certification for Tamarack's ATLAS system from aviation regulatory authorities in Europe and America, Opinion at 16—doesn't tell the full story. Obtaining certification alone was useless to Tamarack because it was not qualified to hold that status; it needed Cranfield not only to apply for certification, but also to then hold it so that the Idaho company could then sell and install the ATLAS system on third-party aircraft in Idaho under the British company's tutelage.

In any event, the contract's "overall purpose" is irrelevant to personal jurisdiction. What matters, instead, is whether the contract required "acts of the [defendant]" directed toward the forum. *Hanson*, 357 U.S. at 254. As explained above, the contract's terms did exactly that, in spades.

Finally, *Sher* would have come out the other way if we had applied the reasoning that the majority employs here. In that case, the "overall purpose" of the business relationship between the defendant law firm and the California clients was to represent the latter in Florida litigation. Even so, we held that the law firm purposefully availed itself of California through its actions directed toward that state— partner visits for meetings, communications with its clients, and its encumbrance of its client's forum property. *See* 911 F.2d at 1362–64.

*Contemplated Consequences*. My colleagues contend that "[n]othing in the contract's contemplated consequences suggests that Cranfield sought to benefit from Idaho's laws," because the contract merely "contemplated that Cranfield would provide technical assistance in obtaining [regulatory]

certifications . . . and serve as Tamarack's main representative" to the relevant agencies, while "Tamarack remained responsible for developing and coordinating all engineering and certification testing." Opinion at 16.

The majority again turns a blind eye toward Cranfield's duty to supervise all of Tamarack's work under the contract, which had foreseeable consequences in Idaho. And although "Tamarack remained responsible for any modifications to the FAA certification and any testing or analysis necessary for the modifications," *id.*, Cranfield in turn was responsible for overseeing and approving that work because the certification was in its name. *See* 14 C.F.R. § 21.120.

And quite apart from its supervision of Tamarack's work, Cranfield's holding of the certification also had foreseeable consequences in Idaho: Tamarack's installation of the ATLAS system on the accident aircraft. The majority, though, minimizes the significance of Cranfield so holding the certification at the time of the installation and later accident, comparing it to the out-of-state legal representation in *Sher*. Opinion at 16.

This analogy is unpersuasive. Cranfield's holding the certification once granted—a valuable property right—is more properly analogized to the Austrian bank's holding of deposit accounts in *Ballard*, which we held satisfied purposeful availment. *See* 65 F.3d at 1498;[5] *cf. Haisten*, 784

---

[5] Indeed, consider a counterfactual where Cranfield breached its obligation to transfer the certification to Tamarack when the latter was finally eligible to hold it. Given that forum-selection clauses are unenforceable against Idaho residents as matter of public policy, *see* Idaho Code § 29-110, in such circumstances a court in that state could surely exercise personal jurisdiction over Cranfield for the same reasons

F.2d at 1398 ("A defendant who enters into an obligation which she knows will have effect in the forum state purposely avails herself of the privilege of acting in the forum state.").

*Actual Course of Dealing*. The majority concludes that the parties' course of dealing does not support purposeful availment because "remote actions taken to service a contract in the forum state seldom lead to purposeful availment by themselves." Opinion at 17 (citing *Sher*, 911 F.2d at 1362). Thus, they reason, "Cranfield's remote work on behalf of Tamarack's ATLAS project does not, without more, establish purposeful availment." *Id*.

This sweeping generalization ignores the Supreme Court's "reject[ion of] the notion that an absence of physical contacts can defeat personal jurisdiction," *Burger King*, 471 U.S. at 476, to say nothing of circuit precedent stating that what matters is not whether a defendant's contacts with the forum under a contract with continuing obligations were remote or physical, *see, e.g.*, *Haisten*, 784 F.2d at 1399 (holding that the defendant purposefully availed itself of the forum state despite "*no* physical contacts between the forum state and the defendant") (emphasis in original); *Hirsch*, 800 F.2d at 1480 (same), but instead the " 'quality and nature' of the relationship created by the contract." *Haisten*, 784 F.2d at 1399 (quoting *Burger King*, 471 U.S. at 480).

Moreover, the majority misapprehends *Sher.* The Florida law firm's communications with its California clients, even when coupled with partner visits to the forum, were relatively weak contacts not because they were *remote* as the

---

that we held a California court could permissibly exercise jurisdiction over the Austrian bank in *Ballard*.

majority implies, but rather because they involved no "affirmative conduct which allows or promotes the transaction of business within the forum state," which is the relevant inquiry. *Sher*, 911 F.2d at 1362 (quoting *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988)). But when conjoined with the law firm's remote encumbrance of the clients' forum property, those contacts collectively created a "substantial [enough] connection with California for jurisdictional purposes." *Id.* at 1363 (cleaned up).

In comparison to *Sher*, the quality of Cranfield's contacts with the Idaho forum is much stronger because the British company "direct[ly] supervis[ed] and control[led]" Tamarack's on-the-ground Idaho activities in their joint production of the deliverables necessary for the certification application. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 313 (1945). To that end, Plaintiffs allege in uncontroverted allegations that we must accept as true, *see Lang Van, Inc. v. VNG Corp.*, 40 F.4th 1034, 1038 (9th Cir. 2022), *cert. denied*, No. 22-937, 2023 WL 3696150, at *1 (U.S. May 30, 2023), that Cranfield gave "substantial and frequent engineering advice and opinions . . . relating to the design, function, and safety aspects" of the ATLAS system and "worked jointly with [Tamarack] to develop materials, procedures, and data to be used in support of" the certification applications. And even after aviation authorities granted certification, Cranfield remained on the Idaho scene to supervise and approve modifications to the certification and Tamarack's installations of the ATLAS system. Following its installation on the accident aircraft in May 2018, Cranfield continued to provide "customer support and engineering services related to" that system until the fatal crash in November 2018.

To my knowledge, no federal court—until today—has ever held that continuous supervision or management of forum-state activities is insufficient to establish personal jurisdiction. To the contrary, and as *Sher* illustrates, we have repeatedly held that continuing remote contacts of much lower quality are enough to sustain such jurisdiction. *See also Silk*, 65 F.4th at 457 (payments for services, coupled with occasional visits and shipments of records); *Glob. Commodities*, 972 F.3d at 1108 (payments for goods); *Columbia Pictures*, 106 F.3d at 289 (payments for television programing licensing rights); *Roth*, 942 F.2d at 621–22 (licensing film rights).

If merely making payments or licensing film rights to a forum state resident in connection with a contract's continuing obligations is purposeful availment, then surely *controlling* ongoing activities in the forum state is as well, as both the Supreme Court and our sister circuits have recognized. *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014) ("[A] corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there."); *Int'l Shoe*, 326 U.S. at 313, 320 (by "direct[ly] supervis[ing] and control[ling]" sales personnel in the forum state, the defendant "received the benefits and protection of the laws of the state" for purposes of specific jurisdiction); *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 125 (2d Cir. 2021) ("[A] relationship of control, direction, or supervision . . . serves the purposeful availment requirement.") (emphasis removed), *cert. denied*, 142 S. Ct. 2852 (2022); *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 901–02 (6th Cir. 2017) (defendant's "directing and controlling" activities in the forum state through "phone and email" and two meetings satisfied purposeful availment); *Miss. Interstate Express,*

*Inc. v. Transpo, Inc.*, 681 F.2d 1003, 1009 (5th Cir. 1982) (defendant's "exercise[] [of] a significant measure of control" over activities in the forum state satisfied purposeful availment); *Whittaker Corp. v. United Aircraft Corp.*, 482 F.2d 1079, 1084 (1st Cir. 1973) (defendant purposefully availed itself of the forum by "actively supervis[ing] or actually participat[ing] in" activities in that state); *cf. Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1119 (6th Cir. 1994) (defendant did not purposefully avail itself of the forum state, in part because it did "not supervise" any activities there).

After dismissing Cranfield's remote supervision of Tamarack's work, the majority then characterizes the two Idaho visits made by the former's personnel as "random, fortuitous, and attenuated, making this case more like *Picot* than *Silk*." Opinion at 19.

The visits in *Picot*, however, were not "envisioned in the initial . . . agreement," 780 F.3d at 1213, which means they were not foreseeable.[6] Here, the contractual terms expressly contemplated the visits, so they can hardly be characterized as "random" or "fortuitous." Nor can they be characterized as "attenuated," because they were to further Cranfield's contractually mandated supervision of Tamarack's work in the forum.[7] This case is more like *Silk* that *Picot*, except that

---

[6] Foreseeability rests at the center of purposeful availment, as it speaks to whether the defendant "reasonably anticipat[ed] being haled into court" in the forum state. *Burger King*, 471 U.S. at 474.

[7] The other key fact distinguishing *Picot* is that unlike here, where Cranfield's performance under the first and third phases of the contract was directed at the forum, in that case the defendant's performance was unrelated to the forum.

Cranfield's contacts with the forum here are far stronger than the contacts that sufficed for purposeful availment in *Silk*.

Finally, in its discussion of the parties' course of dealing, the majority disregards the significance of Cranfield's holding the ATLAS certification. By so holding it on Tamarack's behalf, and by affirmatively approving Tamarack's installation of the ATLAS system on the accident aircraft in Idaho, the British company "performed some type of affirmative conduct *which allow[ed] or promot[ed] the transaction of business within the forum state.*" *Picot*, 780 F.3d at 1212 (emphasis added) (quoting *Sher*, 911 F.2d at 1362).

\*    \*    \*

Sometimes we decide close cases, where only a slight breeze might tip the balance. This is not one of them. Plaintiffs have established that in over six years of continuing obligations, Cranfield remotely supervised Tamarack's work in Idaho, physically supervised that work in two visits expressly contemplated by their contract, held a regulatory certification on Tamarack's behalf that allowed the transaction of business within the forum, and specifically approved Tamarack's installation of the ATLAS system on the accident aircraft in Idaho. That's much, much, more than enough to establish purposeful availment under our published cases. I respectfully dissent from today's aberrational decision.